## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ENJOY THE CITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 04-B-2986-S |
| | ) | |
| QSP, INC.; READER'S DIGEST | ) | |
| ASSOCIATION, INC.; TODD MILLS; | ) | |
| WILL PRICE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment. (Doc. 65.) Plaintiff Enjoy the City [hereinafter "ETC"] brought this case against defendant QSP and its employees, defendants Todd Mills and Will Price, alleging various causes of action arising out of the parties' working agreement in 2003 and 2004. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 65), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment

as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts is left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  <u>STATEMENT OF FACTS</u>[1]

Plaintiff Enjoy the City, Inc., was founded by Anne Stanton in December 2001 or January 2002, and it is in the business of producing and selling discount coupon books

---

[1]If the facts are in dispute, they are stated in a manner most favorable to the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

through direct sales, schools, and non-profit groups.  (Doc. 15 ¶ 9; Def. Evid. Sub., Ex. 2 at 48-49.)  Stanton has more than thirty years of experience in the coupon book business and received an MBA degree from Harvard Business School.  (Def. Evid. Sub., Ex. 2 at ; *id*, Ex. 3.)  Plaintiff hired Robb Dern in September 2002 to take over the company's day-to-day operations as it began printing its first edition of books for fall 2002.  (*Id*. at 49, 61.)  Dern holds an MBA degree from UAB.  (*Id*., Ex. 4 at 11.)

Defendant QSP, Inc., is a wholly-owned subsidiary of the Reader's Digest Association, Inc. and provides fund-raising opportunities for school and community groups though the sale of various products.  (Doc. 15 ¶ 15.)  During the time relevant to this action, QSP employed defendant Will Price as its Chief Financial Officer, and it employed defendant Todd Mills as a Field Sales Manager in Orlando, Florida.  (*Id*. ¶¶ 4, 5, 30.)

Ralph Pinto, Vice-President of defendant's Gift Division; Don Gregory Senior Vice-President of Sales, Doug Hill, and a woman named Zimmerman attended the initial meeting with Stanton, her father and brother, shareholders in ETC, and Robb Dern, CEO of ETC,  on March 21, 2003.  (Def. Evid. Sub., Ex. 2 at ; *id*. at 27-28, 72; *id*., Ex. 6 at 10, 25, 29.)  At this first meeting, the ETC employees expressed concern that QSP would use information gained from the working relationship with ETC to either partner with Entertainment Publications, Inc., [EPI], ETC's competitor, or market its own coupon book.  (*Id*., Ex. 2 at 73-74.)  Dern testified:

> Before we sat down [at the parties' first March 21, 2003 meeting], we
> [ETC] said that we need to discuss the  – everything we're going to share with

you is confidential.  We need some protection.  We know you've had a relationship with Entertainment in the past.  Ray Stanton, III, brought that up as soon as we walked in the room.  And that's when Don Gregory and Ralph Pinto [with QSP] said exactly  – or not word for word, but exactly what I was saying earlier about their past history.  It didn't go well.  They did the little coupon book [with EPI], and it didn't work out, and it broke off kind of ugly, and that no way they would do business again, and they are fierce competitors.  And we said, okay, then you don't have any problem signing off on an agreement, then.  Oh, absolutely not.  We'll get that signed off on for sure . . . .

(*Id.*, Ex. 4 at 89-90.)  Gregory testified that he believed QSP would not work with EPI in the future; he testified, "[I]t wasn't a case that we wouldn't do business with them. . .  I knew they [EPI] said they would not do it [business with us] again."   (*Id.*, Ex. 6 at 45-46.)  Gregory testified that he thought ETC's coupon book was better than EPI's coupon book, but EPI had more markets.  (*Id.* at 42, 82.)

QSP and ETC entered into a Confidentiality Agreement on March 25, 2003, which stated:

[ETC] and QSP intend to disclose to each other certain information about their respective businesses or operations, which each of them considers to be proprietary and confidential, in order to evaluate a potential business arrangement or transaction.  The parties have entered into this Agreement to clarify the terms governing the treatment of such information.

(Doc. 15-2 at 1.)  The Confidentiality Agreement provided, "In consideration for disclosure of the Confidential Information by the disclosing party, the receiving party agrees to not disclose Confidential Information of the other to third parties and further agrees not to use such Confidential Information for any purpose other than the evaluation referred to above."

(*Id.*)  "Confidential Information" is defined to include:

> [A]ll strategies, business plans, results of operations, costs and sales data, financial results and forecasts, marketing plans and results, mailing and account lists, demographic data, and other documentation or information about the business or operations of either party or any affiliate . . . .

(*Id.* )  It also includes "the existence of the Agreement and all discussion between the parties."  (*Id*. at 2.)  "Confidential Information" does not include:

> [I]nformation which (i) was already known to the receiving party prior to disclosure by the disclosing party unless held under an obligation of nondisclosure; (ii) is or becomes publicly available through no fault of the receiving party; (iii) is rightfully received by the receiving party from third parties, without restriction; and/or (iv) is independently developed by the other party.

(*Id*. at 1.)

Dern testified that he understood the Confidentiality Agreement prohibited QSP from partnering with one of ETC's competitors and from starting its own coupon book; he said:

> The two things that it absolutely forbid in the confidentiality agreement and was discussed in that first meeting [March 21, 2003] with all of us in the room was, number one, QSP would not go into business with Entertainment. That was our number one objection, and that's why the [confidentiality] agreement was signed in the first place.  We [ETC] let them [QSP] know that we were very, very concerned that they would go into business with Entertainment.  They [QSP representatives] advised us that they had had a past relationship with Entertainment, that it went sour, that they didn't like Entertainment, and there was no possible way they would ever go into business with Entertainment again.

> The second reason that confidentiality agreement was signed was that they [QSP] wouldn't take it in-house, that they wouldn't take everything they learned from this test, then open the division up in-house and then compete against us.  Ralph Pinto and everyone – and Doug [Hill] and everyone in that room assured us that was definitely not their intent either.  They didn't know anything about the coupon book industry, no knowledge of the coupon book

5

industry.  They would either pick up the product as a line with us at Enjoy The City or they would not carry the product line.

(Def. Evid. Sub., Ex. 4 at 85-86.)

On April 24, 2003, QSP and ETC entered into a Distribution Partnership Agreement for a one-year term.  (*Id*., Ex. 8.)  The DPA was limited to a one-year term to allow QSP to evaluate ETC's coupon book program.  (*Id*., Ex. 2 at 74; *id*., Ex. 4 at 98-99; *id*., Ex. 10.)

In October 2003, defendant assigned the primary responsibility for managing the Distribution Partnership Agreement between QSP and Enjoy the City to Will Price.  (*Id*., Ex. 13 ¶ 2.)  In November 2003, Price told Stanton that "he was the contact person for negotiating a partnership between ETC and QSP."  (*Id*. , Ex. 14 ¶ 30.)  Also in November, Price requested certain information from Stanton and she responded by providing him with allegedly confidential information.  (Doc. 72, Ex. 1 at 156-58; *id*., Ex. 6.)  Price testified that he used this information to provide him "a backdrop of [ETC's] business."  (*Id*., Ex. 1 at 159.)

On April 5, 2004, Price met with Dern and Stanton in Alabama.  (*Id*., Ex. 7 ¶ 5.) Stanton testified:

> In April 2004, Price visited ETC in Alabama and asked Robb Dern and I about specific stats regarding ETC as a company, specific sell through rates per grade, average sale, average size of the middle school ETC was selling as a company, how ETC was growing, what part of the country ETC was specifically strong or weak in, as well as other confidential information.  All of this information is used in ETC's business, was developed as techniques and processes unique to ETC, is not publicly known or generally known in trade or business, cannot be readily ascertained or derived from public

information, is subject to reasonable efforts to maintain its secrecy, and has
significant economic value.

(*Id.*)

Dern testified that, at this time, Price told him QSP was "definitely carrying [ETC
coupon books] through the fall [of 2004]," although they did not agree on a "bigger deal."
(Def. Evid. Sub., Ex. 4 at 117-18, 126.)  On April 26, 2005 in an affidavit, Price denied ever
indicating to ETC that "QSP intended to enter another agreement with it."  (*Id.*, Ex. 13 ¶ 5.)
In his deposition, taken months later, he testified he could not recall telling Dern that the
parties would work together through the fall of 2004.  (Doc. 72, Ex. 1 at 89-91.)

Shortly before the Distribution Partnership Agreement was to expire, on April 14,
2004, Stanton sent Price a "Proposal Partnership Structure."  (Def. Evid. Sub., Ex. 15.)[2]
Stanton repeated this offer on June 19, 2004, and established July 1, 2004 as the deadline for
entering into a new agreement.  (*Id.*, Ex. 16.)  This email stated:

> [W]e are closing our fiscal year [J]une 30th and will need to communicate with
> [QSP] sales reps how we are going to proceed with the new year [ASAP] so
> they don't continue to book business under [QSP].  [L]et's either enter into a
> new agreement by [J]uly 1st or discontinue and revisit in the late fall.
>
> [I]f I haven't heard from you by [J]uly 1st, I'll advise your sales team that we
> are discontinuing our partnership.  [W]e can revisit in [N]ov/[D]ec after

_____

[2]In her email to Will Price accompanying the Proposal, Stanton noted that she had
"outlined several options, including various pricing and the equity and buy-out option.  I
realize you are looking for better margins on our product and believe we can get to the
pricing levels that you would find very attractive. [W]e can get the price reduced by roughly
20% - 50% of your current price based on annual commitment and number of years of
agreement."

[QSP's] fall sales are through when you can dedicate necessary time to throughly review a long term partnership.

(*Id.*)

Even though she did not receive a response to her proposed new agreement, Stanton did not "advise [defendant's] sales team," (*id.*); rather, she sent Price another email that stated:

> **[J]ust wanted to confirm that we have formally discontinued the QSP distributorship.** I hope our test showed the power of the coupon book products in the fundraising industry, as we are on target to hit $15 mill in sales and $5+ mill EBITDA in the next fiscal year.
>
> I'll be forwarding a written termination notice also via [FedEx] to your corporate office. I sincerely appreciate the opportunity to work together, as its been a great learning experience for myself and the Company. **[W]e will make sure to let your sales reps know that we have no relationship with QSP on a going forward basis.**
>
> I do hope that we can sit down again in the next 6-12 months to discuss a potential partnership.
>
> [B]est wishes for a great fundraising season in the Fall of 2004.

(*Id.*, Ex. 17 [emphasis added].) Don Gregory, Senior Vice President of Sales. (*id.*, Ex. 6 at 10), responded to Stanton's email, stating, "Please DO NOT contact any of our sales reps! I just found out [Price] is on vacation. I need to discuss this with him. If any of them have any questions, refer them to me," (*id.*, Ex. 18).[3] Gregory did not indicate that he thought

---

[3]To the extent QSP reps continued to procure sales for fall 2004 on behalf of ETC during that summer, they had ETC's full permission to do so. (Def. Evid. Sub., Ex. 4 at 127; *id.*, Ex. 12 at 56-57.)

8

Price might go forward with a new agreement with ETC; he stated only that he did not want Stanton contacting QSP's Sales Representatives.  (*Id*.)

By the terms of her emails to Price, Stanton understood that the DPA was terminated and ETC was no longer working with QSP's Sales Representatives.  (*Id*., Ex. 2 at 122-23.) Many times during the test agreement, Gregory told Stanton, "You cannot deal directly with our reps.  We are a company, and [ETC] has to go through us."  (*Id*., Ex. 6 at 52.)  Stanton understood that ETC could no longer work with QSP Sales Representatives after the DPA terminated;  However, she testified that she thought ETC and QSP were still working in August 2004 and QSP continued to book business.  (*Id*., Ex. 2 at 151-52, 153-56.)  Stanton testified:

> It was misrepresented to me not to stop – it was misrepresentation not to stop booking business when you know in less than a month you're going with our main competitor and the time and sense of urgency this industry has. It was a misrepresentation by his – under his direction, him being Will [Price], possibly Gary.  I'm not sure how much information he knew.  Definitely Will. Don following Will's instruction, knowing it wasn't true, to book business on our contracts, knowing that our implied agreement that occurred after this written distributorship expired was based on as we worked out an equity structure deal going into 2005.  And if we didn't, at a later date.
>
> . . . Don Gregory . . . misrepresented to me that it was okay to continue, knowing very well that another deal was close to or in the process of or finalized with Entertainment.

(*Id*. at 155-56.)

Although ETC claimed confusion about the status of the ETC-QSP relationship in an email to Price, dated July 20, Stanton wrote:  "[W]e have halted all communications and

fundraising between Enjoy the City and [QSP] sales reps per [D]on's request . . .we have no scheduled shipments for [QSP], as I haven't heard back from anyone on renewal and assumed contract was terminated."[4]  (*Id*., Ex. 19.)  Stanton testified that this email was her attempt to give QSP the opportunity to terminate the parties' relationship, which QSP did not take.  (*Id*., Ex. 2 at 151-52.)  She testified:

> He [Will Price] continued from a period of April to August to lead me along through a series of e-mails to believe in good faith, which is what I operate in business, in good faith, to believe he was in a data collection mode to determine the equity partnership potential of a deal structure in which they would receive equity in exchange for purchase and sales.  . . .
>
> In good faith I tried to bring an end to our potential equity structure that I was offering, highly confidential.  They told me not to, so I continued in good faith to book business for the fall.  [Price] had the power at any given time to call a conference call, as he did in August [2004], to place an end to all these bookings that were coming in for the fall.  And by his misrepresenting to me that we were still working on this deal, I gave him privileged pricing for those fall bookings.  I didn't interfere with those relationships, which is a very key thing in this business.

(*Id*.)

On July 27, 2004, Stanton proposed another long-term agreement to QSP and suggested that the companies "try to resolve one way or the other by Friday . . . [and] we'll

---

[4]Unbeknownst to QSP and contrary to its instructions to ETC regarding its contacts with QSP Sales Representatives, ETC invited Mills, a QSP Sales Representative from Florida, to a sales incentive trip in San Juan in late July 2004.  (*Id*., Ex. 14 ¶ 33.)  ETC had also taken Mills on a trip to Aruba after the test agreement expired in late April 2004.  (*Id*. ¶ 17.)  According to Mills, Stanton repeatedly told Mills that her objective was to sell ETC to QSP, and she asked him to persuade QSP to work with ETC.  (*Id*., Ex. 20 ¶ 2.)

hold all shipments until/unless directed to do otherwise by you." (*Id*., Ex. 21.)  This email

to Price stated:

> [A]ttached is the document as discussed with booked activity. [T]his is only activity for contracts currently in house . . . . [I]t looks like we have approximately $1 mill in booked gross business based on our average sell through (this is primarily 4 reps – [T]odd, [L]arry [B]ill, [L]arry [N]orton, and [M]elissa.

> [A]s far as scale for this year, I think you'd be at about $3mill-$5mill gross sales from [A]ug[.] '04 – [J]uly '05 if sold in all available markets.

> **[A]s far as a going forward basis, please let's try to resolve one way or the other by [F]riday . . . we'll hold all shipments until/unless directed to do otherwise by you.** [J]ust let me know one way or another which of the 4 options you'd like to follow:

> 1) service existing groups and wind down and revisit a partnership or buy-out in a couple of years when we are in 100+ markets if you are interested in coupon books as a new product line extension at that time;

> 2) completely discontinue relationship immediately and do not ship any new product and revisit partnership in another 12-18 months;

> 3) open up to all current available markets (about 40 now and 15 new for spring '05 and 25 more new fall '05) and develop out new markets together as a key distributor with an agreed upon purchase price per book;

> 4) partner now with terms outlined in the proposal sent in [A]pril . . . .

> . . . I'm very confident I'll be able to sell the Company within 2-3 years for the return that our family is looking for . . . . would enjoy the opportunity to continue working together.

(*Id*., Ex. 21.)  (Emphasis added.)  Despite Stanton's assertion that she would hold all

shipments, on or about July 26, 2004, ETC drop-shipped 7,000 books to Mills's home. (*Id*.,

Ex. 14 ¶ 35.)

ETC took defendant Mills to Puerto Rico in late July 2004.  (*Id*., Ex. 4 at 137.)  During this trip, ETC agreed to sell Mills over 7,000 coupon books at a discount because ETC's new book was scheduled for release in August.  (*Id*. at 140.)  The books contained a Quizno's coupon that Stanton had agreed she would not include in the book.  (*Id*., Ex. 29 at 125-26.)[5]  QSP tried to return these books, but it was unable to do so.  (*Id*., Ex. 22.)   Dern testified that the books "were at the end of the season books that were sold to Mr. Mills at a discount, no returns.  (*Id*., Ex. 4 t  136.)  He said Mills told him to "consider [the books] sold."  (*Id*. at 137.)   Price testified that QSP sales reps are employees of QSP and not independent contractors.  (*Id*., Ex. 13 ¶ 6.) Therefore, Mills did not have authority to contract with ETC.  (*Id*. ¶¶ 6-8; *id*., Ex. 20 ¶¶ 7-8.)

Dern testified that, in April 2004, Price represented that, at "the very least [QSP] would carry the [ETC] books through fall of '04."  (*Id*., Ex. 4 at 110.)  He testified that under this verbal deal with Price, that QSP continued to book business for ETC through early August.  (*Id*. 110-11.)

Entertainment Publications, Inc., ("EPI"), is in the business of marketing coupon books and discount and merchant promotions, as well as offering other fund-raising products.  (*Id*., Ex. 23 at 7; doc. 72, Ex. 4 at 1.)  In 2003 and 2004 Alan Bittker, President and CEO of EPI, was primarily responsible for negotiating a cross marketing agreement between EPI and

---

[5]The reason Stanton allegedly agreed to remove the Quizno's coupon is that ESP did not have permission from all Quizno's locations that they would honor the coupon.

QSP.  (Def. Evid. Sub., Ex. 23 at 18.)  Bittker testified that in late 2003 he was approached by Will Price to discuss a possible relationship between EPI and QSP.  *Id*. at 10.  According to Bittker's testimony and his notes from his meetings with Price, Price told him the following:  (1) the ETC "test was going well," (*id*., Ex. 23 at 14, 49; *id*, Ex. 26); (2) "that the Enjoy the City product was 20 dollars, and that 30 – typical 30 to 50 percent went to the account, commission, just like our book;" (*id*., Ex. 23 at 55; *id*., Ex. 26), and (3) ETC was "doing special expiration date for spring sale," (*id*., Ex. 23 at 55-56; *id*., Ex. 26).

Bittker's notes also contain a notation that Price would give Bittker QSP's "stats from [its] test [with] Enjoy the City, and stats from their reg. gift bus." (*Id*., Ex. 26.)  Bittker testified that Price did not give him the stats from the tests or the sell through of the ETC coupon books.  (*Id*., Ex. 23 at 53.)  Bittker testified that Price told him he could not reveal the sell-through rate because QSP was "in an existing relationship with Enjoy the City." (*Id*.)  Also, he testified that Price had not said that he would give Bittker the "stats from QSP's test with Enjoy the City." (*Id*. at 57.)  Bittker testified that his notes from the December 19, 2003 meeting reflected his own thoughts as to what he wanted from ESP.  (*Id*. at 57-59.)  He repeatedly said Price did not give him this information.  (*Id*. at 58, 59.)  Specifically Bittker testified, "Well [Price] called me following that [meeting], and said I will give you the info on the gift business and I will send it over to you, but I am not going to give you the info on the coupon book, we have an existing relationship with ETC." (*Id*. at 59.)

QSP and EPI did not discuss market-penetration rates of ETC coupon books, how the ETC-QSP relationship worked, or which QSP accounts had sold ETC's coupon books. (*Id.*, Ex. 27 at 41-42, 53-54.)  When asked, Price told Bittker that he was not sure if the relationship with ETC would continue (*Id.*, Ex. 23 at 51.)  As of June 15, 2004, EPI did not believe it had a deal with QSP.  (*Id.*, Ex. 27 at 47, 54-55, 76-77, 79.)

In 2004, ETC printed the expiration date of each discount on the face of every coupon. (*Id.*, Ex. 31.)  ETC printed the price of its book on the cover.  The $20 version of the Orlando book explains that the account keeps 50% of all revenue, $10 a book, if it sells 500 or more books; it keeps $9 per book if it sells 251-500 books; it keeps $8 per book if it sells 101-250 books; and it keeps $7 per book if it sells 1-100 books.  (*Id.*, Ex. 25.)

EPI and QSP entered a cross-marketing agreement on August 3, 2004, that required EPI to offer QSP magazine products through existing EPI accounts and required QSP to offer EPI coupon books through existing QSP accounts.  (*Id.*, Ex. 27 at 8-10.)  One of the terms of this agreement was that EPI would charge QSP $3.00 per book.  (Doc. 72, Ex. 10 at 000654.)[6]

_____

[6]On this point, the Cross-Marketing Agreement provided specifically as follows: "During the Initial Term, for Entertainment Books provided to QSP from existing EPI inventory, the Delivered Cost is agreed to be $3.00 per book.  For other Entertainment Books provided to QSP in the Initial Term (i.e., those that were re-printed), Delivered Cost shall be $4.35 during the Initial Term to reflect estimated costs and shall then be adjusted by EPI by June 30, 2005 to reflect actual production, storage and freight and fulfillment charges." (Doc. 72, Ex. 10 at 000654.)

Bittker testified that EPI proposed the $3 cost in March 2004[7] and that $3.00 was used as a "proxy" but adjusted based on real costs, reprints on other actions that could affect the cost.   (Def. Evid. Sub., Ex. 23 at 40-43.)

On August 4, 2004, Price wrote Stanton an email, which stated, "Reps are in process of compiling info.  I do not have at this point in time.  Will advise once available.  Please do not contact reps directly as the ball is rolling on this collection exercise." (*Id*., Ex. 28.)  On August 10, 2004, Price wrote Stanton, "Still working to collect account info from reps involved.  I would like to have a discussion with you.  What is your availability???"  (Doc. 72, Ex. 14.)  Stanton responded, On August 12, 2004,  as follows:

> [P]lease advise as to the relationship between ETC and QSP, as I am hearing several stories from the field and need to get an update on the test directly from you. . . .

> [I] need to find out how best to handle the roughly $1mill in booked business, as many groups were schedule[d] to start already and/or have kick-offs scheduled to begin soon.

---

[7]Bittker testified:

Q:    How did ya'll arrive at that price?

A:    We proposed it.

Q:    Okay.  Did QSP come back with a counter offer, like say this is what ETC is offering us, can you all beat it?

A:    No.

*Id*. at 41.

[C]an you let me know if you have finished your data collection with the reps and next steps as soon as possible.

(*Id.*, Ex. 2.)

Around this time, QSP issued an internal announcement to its sales reps that QSP was

partnering with Entertainment.  The announcement stated, in part:

> As some of you in the south and northeastern part of the country know, we ran a successful small program this past Fall/Spring with another company's coupon book product. Ultimately, we decided to pursue & ultimately join forces with the #1 player in coupon books and offer the [EPI coupon book] as a new product offering.  I thank the FSMs [field sales managers] who helped us learn about his product.

(*Id.*, Ex. 4 [original emphasis deleted].)   Price admitted that the "successful program"

referred to in the announcement was ETC's program.  (*Id.*, Ex. 1 at 208.)

On August 24, 2004, Price sent Stanton the following e-mail:

> Attached is the list of signed agreements submitted by QSP FSM's as noted. . . .

> As you know I have been compiling this over the last 3 weeks and I believe this is final . . . .  Please match up your internal records and advise.  Our reps have been advised that accounts on this with ETC agreements to sell ETC Books are ETC accounts and must be run/launched by ETC reps. . . . and since QSP's relationship with ETC terminated in April that they cannot run/launch or in any way be involved in selling ETC Books in these accounts.

> Also, Todd Mills has indicated he has 5,000 books in his garage that we need to return to you.  He is the only rep so far that has indicated personal inventory. . . .  Please advise as to how you would like to handle Todd's inventory.

(Doc. 20, Ex. B, Part 2, at 15.)

16

After QSP informed its Sales Representatives that they would not handle ETC's coupon books, Mills told his accounts that QSP and ETC were not working together any longer.  Three of these clients asked questions.  (Def. Evid. Sub., Ex. 29 at 136-37, 139.)  In response to their queries, Mills told them he could not comment on the matter and faxed the clients a letter from a local Quizno's restaurant.  (*Id*. at 136-37.)  The letter was written by a Quizno's owner and was given to customers that presented the Quizno's coupon from the ETC book.  This letter states:

> Dear Valued Customer:
>
> You have been given this paper because you have presented to us an "ENJOY THE CITY" coupon offer from their 2004 publication.
>
> We want you to understand that the Company, Enjoy the City, Inc. of Birmingham, Alabama printed these coupons without the permission of the Quizno's Corporation or any of it's [sic] franchises with the exception of the Quizno's located . . . in Apopka. . . .  Enjoy the City abused their authority and irresponsibly printed this coupon purposely omitting any addresses knowing fully well that they only had one store under contract for this offer.
>
> Enjoy the City, Inc. did this in an effort to sell more books, thus profiting more from each sale.  We are not the only restaurant they have done this to.
>
> . . .
>
> Ultimately, I urge you to call Natalie, the publisher of Enjoy the City directly . . . and demand a refund for any and all money they have charged you for the book.  This problem occurred because of an untrustworthy company gaining your trust and money and reaping enormous benefits at the expense of others.
>
> . . .
>
> We are currently looking into litigation against Enjoy the City, Inc. and ask that you do not recommend or purchase this publication in the future unless

17

you understand the implications of such false advertising.  When an offer is "to [sic] good to be true" . . . then more likely "it is to [sic] good to be true."

(Def. Evid. Sub., Ex. 30.)  Mills distributed the Quizno letters to the ETC accounts after the ETC-QSP partnership ended.[8]  (*Id*., Ex. 29 at 149.)  Dern testified that the Quizno letter was "completely false."  (*Id*., Ex. 4 at 158.)  Nevertheless, he admitted that he did not know if ETC had printed the coupon with prior approval.  (*Id*. at 160-61.)  Stanton also testified that she did not know if ETC had or had not printed the Quizno's coupon with the authorization of Quizno's Corporation or any franchises except the one in Apopka.  (*Id*., Ex. 2 at 182-83.)  Mills testified that Stanton had told him it was a mistake to include the coupon in the 2003 book and in the reprints.  (*Id*., Ex. 29 at 140-141.)

ETC does not know whether any of the three clients that received this letter from Mills cancelled a sale as a result of receiving the letter.  (*Id*., Ex. 2 at 186.)  In fact, all three schools conducted sales with ETC in the fall of 2004.  (*Id*., Ex. 31 at 1303.)  However, approximately two years later, in fiscal year 2006, one of the schools to which Mills sent the Quizno's letter – Central Florida Christian – switched its account to EPI.  (*Id*., Ex. 29 at 139, 177-79.)

---

[8]The deposition testimony of Mills is inconsistent regarding whether or not he believed ETC was untrustworthy.  (*Compare* Def. Evid. Sub., Ex. 29 at 154-55, 198-99 [characterizing ETC's actions of running the Quizno's coupon as "mistake"], *with id.* at 190-93 [testifying that ETC was "untrustworthy" because it re-ran the Quizno's coupon].) Nevertheless, at the time he sent the Quizno's letter, (*id*., Ex. 30), Mills apparently did not believe ETC was "untrustworthy."  (*Id*., Ex. 29 at 201-02.)

## DISCUSSION

Plaintiff's Amended Complaint contains 25 claims against the three defendants:

Count 1: Intentional, Willful, and/or Wanton Misrepresentation against QSP based on its alleged misrepresentation that plaintiff and QSP would be partners for Fall 2004;

Count 2:  Intentional, Willful, and/or Wanton Misrepresentation against QSP based on its alleged misrepresentation that it had no intention of doing business with EPI;

Count 3:  Intentional, Willful, and/or Wanton Misrepresentation against QSP based on its misrepresentation that it had contracts for plaintiff's books for the Fall of 2004;

Count 4:  Intentional, Willful, and/or Wanton Misrepresentation against Price based on his alleged misrepresentation that QSP would partner with plaintiff in the Fall of 2004;

Count 5: Innocent, Mistaken, and/or Negligent Misrepresentation against QSP based on the alleged representations set forth in counts One-Three;

Count 6:  Innocent, Mistaken, and/or Negligent Misrepresentation against Price based on the alleged representation set forth in Count Four;

Count 7:  Deceit against QSP based on its alleged representation that QSP would partner with plaintiff in Fall of 2004;

Count 8:  Deceit against Price based on his alleged representation that QSP would partner with plaintiff in Fall of 2004;

Count 9:  Suppression against QSP based on its alleged failure to tell plaintiff that it had a deal with EPI that it would not partner with plaintiff in Fall 2004 and that it told EPI confidential information;

Count 10: Suppression against Price;

Count 11: Promissory/Equitable Estoppel against QSP;

Count 12: Promissory/Equitable Estoppel against Price;

Count 13: Promissory/Equitable Estoppel against Mills;

Count 14: Breach of Contract against QSP;

Count 15: Defamation against Mills based on his publication of the Quizno's letter;

Count 16: Negligent Supervision against QSP and Price based on their alleged failure to supervise defendant Todd Mills, and QSP representatives, Dan Mills and Mark Lang;

Count 17: Intentional Interference with Business Relations against QSP;

Count 18: Intentional Interference with Business Relations against Mills;

Count 19:  Breach of Fiduciary Duty against QSP;

Count 20:  Nonpayment against QSP;

Count 21:  Nonpayment against Mills;

Count 22:  Misappropriation of Trade Secrets against QSP based on its disclosure and unauthorized use of its confidential information;

Count 23:   Unfair Competition/Disparagement against QSP;

Count 24:  Lanham Act against QSP and Mills based on their false and deceptive statements regarding plaintiff and its product;

Count 25:   Civil Conspiracy against QSP and Price based on allegations that they conspired with Sarah Lipszyc to violate the Confidentiality Agreement.

(Doc. 15.)  The court dismissed Count 19 on December 1, 2005.  (Doc.  25.)  Plaintiff has

abandoned Counts 2, 17-18, and 23, as well as Count 5 to the extent it embraces conduct set

forth in Count 2.[9]  *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(plaintiff abandoned claims by failing to respond to defendant's Motion for Summary Judgment)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).  Therefore, defendants' Motion for Summary Judgment as to Counts 2, 17-18, 23, and part of 5 of plaintiff's Amended Complaint will be granted, and such claims will be dismissed.

## A. BREACH OF THE CONFIDENTIALITY AGREEMENT – COUNTS 14, 19, and 22

"To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."  *S.B. v. Saint James School*, 959 So. 2d 72, 87 (Ala. 2006)(internal citations and quotations omitted).  The Confidentiality Agreement, by its terms, is to be construed according to New York state law.  New York law provides:

> The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.  The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.

---

[9]Plaintiff's Opposition to defendants' Motion for Summary Judgment does not discuss these claims.  (*See* doc. 72-2 at 26, 31, 37-41.)

*Greenfield v. Philles Records, Inc.*, 780 N.E. 2d 166, 170 (N.Y. 2002)(internal citations and quotations omitted).  The court finds the Confidentiality Agreement is "complete, clear, and unambiguous on its face;" therefore, it will "be enforced according to the plain meaning of its terms." *Id.*

According to ETC, the following information was disclosed in breach of the Confidentiality Agreement:[10]

    1.  On December 19, 2003, Price disclosed to Bittker:

        (a)  "discussions between the parties,"
        (b)  the "stats" of the test program,
        (c)  QSP was booking accounts for spring 2004 sale,
        (d)  Books for spring sale would cost $20 and the profit was 30-50%,
        (e)  ETC's spring book would have a special expiration date,
        (f)  QSP estimated need based on its sales representatives performance under the Distribution Partnership Agreement.

    2.  April 7, 2004, Price disclosed to Bittker:

        that ETC offered QSP books at $3.00 a piece for future book purchases.[11]

(Doc.  72-2 at 24-27.)

---

[10]Plaintiff does not contend that defendants disclosed any trade secrets separate from those disclosed in violation of the Confidentiality Agreement.   (*See* doc. 72-2 at 28.) Therefore, the court finds that plaintiff does not have a separate trade secrets claim.

[11]Plaintiff argues that the fact that on April 5, 2004, Stanton and Dern "told Price that ETC could probably get to $3.00 per book" and that Price then met with EPI two days later, and that the subsequent agreement between EPI and QSP provided for $3.00 for the "Initial Term" creates a genuine issue of material fact as to whether Price disclosed to EPI the $3.00 price point he had negotiated with ETC, in violation of the Confidentiality Agreement. (Doc. 72-2 at 27.)

### 1. Spring Book Sale, Profit, and Expiration Date – Not Confidential Information

Defendants first contend that the undisputed facts show that QSP did not divulge any of ETC's confidential or trade secret information to EPI.  Having carefully reviewed the evidence, the court finds, as discussed more fully below, that no genuine issue of material fact exists as to whether QSP, through its agent Price, divulged information which would violate the confidentiality agreement.  Therefore, QSP and Price are entitled to judgment as a matter of law on Counts 14, 19, and 22, which allege a violation of the Confidentiality Agreement between QSP and ETC.  Defendants contend that it did not breach the Confidentiality Agreement by revealing to EPI on December 19, 2003, that ETC was doing a special expiration date for ETC's spring sale.[12]  The agreement defines "confidential information" to include:

> [A]ll strategies, business plans, results of operations, costs and sales data, financial results and forecasts, marketing plans and results, mailing and account lists, demographic data, and other documentation or information about the business or operations of either party or any affiliate . . . .

(*Id.* )  It also includes "the existence of the Agreement and all discussion between the parties."  (*Id*. at 2.)  "Confidential Information" does not include:

> [I]nformation which (i) was already known to the receiving party prior to disclosure by the disclosing party unless held under an obligation of nondisclosure; (ii) is or becomes publicly available through no fault of the receiving party; (iii) is rightfully received by the receiving party from third

---

[12]Bittker testified Price did not tell him the actual expiration date.  (Def. Evid. Sub., Ex. 23 at 56.)

parties, without restriction; and/or (iv) is independently developed by the other party.

(*Id*. at 1.)

The evidence reveals that information regarding the fact of a spring sale, the expiration date of coupons, and the profit percentage were evident when the spring 2004 coupon books were published and sold.  (*See* Def. Evid. Sub., Ex. 25.)  Clearly information contained in the books and the fact of the special expiration date in the spring sale is information publicly available through no fault of QSP.  Moreover, the information was publicly available for months before EPI published a new book.

The court finds that no breach of the Confidentiality Agreement based on alleged disclosure of information readily available from the sale of the spring 2004 coupon books.

**2.  Stats of the Test Agreement, Price to QSP per Book, Other Information Regarding ETC's Business Operations – Fact of Disclosure**

Plaintiff argues that "the fact that QSP entered into a very large distribution agreement with [EPI] . . . suggests . . . that [QSP] used [the] knowledge gained from the partnership with ETC to enter into an arrangement with a competitor, which was the whole purpose of the confidentiality agreement."  (Doc. 72-2 at 22 [internal quotations omitted].)  Although plaintiff argues that its understanding of the confidentiality agreement was to keep QSP from partnering with EPI or from taking the coupon book business in-house, (*see* doc. 72-2 at 9),[13]

---

[13]Despite this argument plaintiff states that "ETC does not claim that the confidentiality agreement prohibits QSP from ever entering into the coupon book business." (Doc. 72-2 at 57.)

the clear and unambiguous language of the agreement does not support such an interpretation. ETC would have the court (or a jury) convert the Confidentiality Agreement into a non-compete agreement. Unfortunately for ETC, the language in the Confidentiality Agreement is not that broad. It also questions the veracity of Price and Bittker's testimony that Price never revealed confidential information. It has offered no direct evidence of a breach of the Confidentiality Agreement.

The issue, therefore, is whether the facts that Price negotiated an agreement between EPI and QSP and that he possessed confidential information is sufficient evidence to allow a reasonable jury to infer that Price disclosed the confidential information to Bittker. On summary judgment, the court must draw "[a]ll reasonable inferences . . . in favor of the nonmovant. However, an inference based on speculation and conjecture is not reasonable." *Chapman v. American Cyanamid Co.* 861 F.2d 1515, 1518 (11th Cir. 1988)(citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985); *Lee v. Celotex*, 764 F.2d 1489 (11th Cir. 1985)). Some degree of conjecture is inherent in any inference. *Daniels v. Twin Oaks Nursing Home* 692 F.2d 1321, 1326 (11th Cir. 1982)(citing *Helene Curtis Industries, Inc. v. Pruitt*, 385 F.2d 841, 851 (5th Cir. 1967), *cert. denied*, 391 U.S. 913 (1968)). Nevertheless, an inference is not reasonable if the degree of speculation and conjecture renders the inference "a guess or a mere possibility." *Id.*

As to the $3 price and the "stats" defendants have presented evidence in support of their Motion for Summary Judgment that Price did not disclose ETC's offer of $3.00 per

book or the "stats" of the test agreement.  Therefore, "the burden [on summary judgment] shift[ed] to [ETC] to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence."  *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992)(quoting *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 502 U.S. 1048 (1992)).  The evidence presented by ETC consists of Bittker's note stating that Price would give Bittker QSP's "stats from [its] test [with] Enjoy the City."  However, defendants presented evidence that Price did not give EPI any information regarding the test with ETC.  Plaintiff's evidence that Bittker wrote down that Price, at some future date, would give him such "stats" is not sufficient to rebut the testimony that he did not given Bittker such information.

Similarly evidence that ETC offered QSP books at $3.00 per book is not sufficient evidence to rebut defendants' showing that EPI suggested $3.00 per book to QSP and that QSP did not suggest the price.  Mere evidence of the same cost for each book is not significantly probative as to whether Price told Bittker ETC  had offered him $3.00 per book. If, perhaps, plaintiff had offered evidence that $3.00 was not EPI default cost or that $3.00 was unusual in the industry, the coincidence of the cost per book may be probative. However, ETC's only evidence is the coincidence.  Thus, the inference, plaintiff requests the court (and jury) to find is based on a degree of speculation that is no more than "a guess or mere possibility."

The court finds that ETC has failed to rebut defendants' showing that they are entitled to judgment as a matter of law on plaintiff's breach of contract  claims.

## B.  TORT CLAIMS – CHOICE OF LAW

"A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007); *Glass v. Southern Wrecker Sales*, 990 F. Supp. 1344, 1347 (M.D. Ala. 1998)(citing *Trumpet Vine Investments v. Union Capital Partners I, Inc.*, 92 F.3d 1110 (11th Cir. 1996)).  "Alabama choice of laws rules follow the doctrine of *lex loci delicti*, which provides that tort claims are governed by the law of the place where the harm occurred." *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 124 F. Supp. 2d 1243, 1248 (M.D. Ala. 2000)(citing *Fitts v. Minnesota Mining & Manufacturing Company*, 581 So. 2d 819, 820 (Ala. 1991)).  With regard to fraud claims, "courts consistently conclude that the state where the injury occurred in a fraud claim is the state in which the plaintiff suffered the economic impact." *Glass v. Southern Wrecker Sales*, 990 F. Supp. 1344, 1348 (M.D. Ala. 1998).  For defamation claims, "[t]he place of injury is the place where the defamatory communication is published, which means that it is brought to the attention of someone other than the person defamed."  Restatement (2d) of Conflicts § 149; *see also Yang v. Lee*, 163 F. Supp. 2d 554, 561 (D. Md. 2001).

## C. MISREPRESENTATION – COUNTS 1, 3-8

In Alabama, "The elements of a fraud claim are (1) a false representation, (2) of a material existing fact, (3) reasonably relied on by the claimant (4) who suffered damage as a proximate consequence of the misrepresentation." *Drummond Co., Inc. v. Walter Industries, Inc.*, 962 So. 2d 753, 788 (Ala. 2006)(citing *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143 (Ala. 2003)). In its Opposition, plaintiff limits its representation claims to Price's representation that ETC and QSP had an agreement to work together in the fall of 2004. The court finds that defendants' Motion for Summary Judgment as to plaintiff's misrepresentation claims is due to be granted because plaintiff has not established that it reasonably relied upon Price's statement that QSP and ETC would work together in fall of 2004.

The Alabama Supreme Court has held:

> Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.

*Torres v. State Farm Fire & Cas. Co.*, 438 So.2d 757, 758-59 (Ala. 1983), *quoted in McIver v. Bondy's Ford, Inc.* 963 So.2d 136, 142 (Ala. Civ. App. 2007).

In this case, Stanton's e-mails show that she did not believe ETC had an agreement to work with QSP *after* Price allegedly promised QSP would work with ETC in the fall of

2004.  She stated repeatedly in emails to Price that she wanted a deal or wanted to know if they had a deal for the fall of 2004, thus demonstrating that she did not believe such a deal had been made in early April 2004.  Thus, plaintiff has not shown that it reasonably relied on Price's statement that the parties would work together in the fall of 2004.

Defendants' Motion for Summary Judgment will be granted as to plaintiff's misrepresentation claims and such claims will be dismissed.

## D.  SUPPRESSION – COUNTS 9-10

Plaintiff contends that defendants fraudulently suppressed the fact that they were in negotiations with EPI.  "Alabama law provides that, to prevail on a claim of fraudulent suppression, a plaintiff must show: '(1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression.'"  *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005)(quoting *Ex parte Dial Kennels, Inc.*, 771 So. 2d 419, 421 (Ala. 1999)).

> "The question whether a party had a duty to disclose is a question of law to be determined by the trial court." *Barnett v. Funding Plus of America, Inc.*, 740 So. 2d 1069, 1074 (Ala. 1999), citing *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998).  The trial court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Owen*, *supra*, 729 So. 2d at 842-43.

*Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So. 2d 665, 676-77 (Ala. 2001).

"When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose arises when information is not requested." *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238, 245-46 (Ala. 1992)(citing *Norman v. Amoco Oil Co.*, 558 So. 2d 903 (Ala. 1990)); *see Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1278 (M.D. Ala. 2007) ); *see also Richard Brown Auction & Real Estate, Inc. v. Brown*, 583 So. 2d 1313, 1317 (Ala. 1991)("Considering the relative knowledge of the parties, this Court has recognized that an obligation to disclose does not arise where the parties to a transaction are knowledgeable and capable of handling their affairs.")(citations omitted)

Plaintiff and defendants negotiated at arm's length. Plaintiff's principals are educated and experienced in the business of selling coupon books. Moreover, plaintiff did not ask QSP or Price if they was negotiating with EPI. The court finds QSP and Price had no duty to tell ETC that QSP was negotiating with EPI.

Defendants' Motion for Summary Judgment is due to be granted as to plaintiff's fraudulent suppression claims and such claims will be dismissed.

## E. PROMISSORY AND EQUITABLE ESTOPPEL – COUNTS 11-13

In Alabama estoppel is not a separate cause of action; rather the doctrines can be used defensively to "prevent[ ] an otherwise unjust result." *General American Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 899 (11th Cir. 1996)(citing *Williams v. FNBC Acceptance*

30

*Corp.*, 419 So. 2d 1363, 1367 (Ala.1982)); *see also Haginas v. Haginas*, 598 So. 2d 1334, 1337 (Ala. 1992).  As such plaintiff's claims of promissory and equitable estoppel, Counts 11-13, are due to be dismissed.

## F.  CIVIL CONSPIRACY - COUNT 25

Plaintiff contends that summary judgment is due to be denied as to it civil conspiracy claim because a question of fact exists as to whether defendants disclosed confidential information.  For the reasons set forth above, this court finds that no question of fact exists as to the disclosure of confidential information.  Therefore, defendants' Motion for Summary Judgment as to this claim is due to be granted and such claim will be dismissed.

## G.  DEFAMATION - COUNT 15

Plaintiff claims defendant Mills defamed it by publishing the Quizno letter.

The place of injury in a defamation case is where the publication occurred.  In this case, the publication of the Quizno letter occurred in Florida.  Therefore, Florida law would apply under Alabama choice of law principles.

Under Florida law:

"Pure opinions" are not actionable out of a deference for free speech and the First Amendment. But a "mixed opinion," which is based on ***undisclosed*** facts that infer the plaintiff has committed an illegal act, or one that damages his or her business reputation, is actionable.  ***The facts upon which the opinion is based must be stated and disclosed or known to the audience to whom the publication is made not to be actionable.***

*Scott v. Busch*, 907 So. 2d 662, 667-68 (Fla. App. 2005)(footnotes omitted; emphasis added).

"The determination of which category the alleged statement fits in, pure opinion or mixed,

is normally a decision for the trial court, reviewable de novo by an appellate court." *Id*. at 668 (footnote omitted).

The Quizno letter, set forth in its entirety above, states that ETC is "untrustworthy" and "irresponsible," which ETC denies.  However, the court finds that these words express the writer's opinion based on the disclosed fact that ETC "printed [Quizno's] coupons without the permission of the Quizno's Corporation or any of it's [sic] franchises with the exception of the Quizno's located . . . in Apopka." (Def. Evid. Sub., Ex. 30.)  Nothing in the record indicates that this fact is false.  Indeed, the evidence shows that ETC reprinted the Quizno's coupon, without limiting its use to Apopka, Florida, location, even after Stanton told Mills she had made a mistake and the coupon would be removed from future reprints.

The court finds that the Quizno letter is not defamatory because it expresses an opinion based on disclosed facts.  Therefore, plaintiff's defamation claim against defendant Mills will be dismissed.

## H.  NON-PAYMENT - COUNTS 20 and 21

In its brief, plaintiff argues that defendant Mills owes for $7,700 books he ordered during the end of April on a trip to Aruba.  (Doc. 72-2 at 17.)  However, in her affidavit, Stanton testified that these books were ordered and shipped on July 26, 2004.  (Def. Evid. Sub., Ex. 14 ¶¶ 33-35.)  If Mills ordered the books on or about July 26, 2004, plaintiff knew it was not authorized to make such an agreement with Mills on behalf of QSP.  (*Id*., Exs. 19 and 21.)

32

Plaintiff has not shown that Mills was authorized to make an agreement for selling the books on behalf of QSP and this fact was known to Stanton at the time the books were shipped.  Therefore, plaintiff has failed to show that it had a binding agreement with Mills for payment for the books and defendants are entitled to judgment as a matter of law on these claims.

## I.  LANHAM ACT – UNFAIR COMPETITION/DISPARAGEMENT - COUNTS 23 and 24

Plaintiff contends that its Lanham Act and unfair competition claims are based on the Quizno letter and QSP marketing ETC books after April 2004 without ETC permission. These claims are due to be dismissed.

The undisputed evidence is that Mills sent the Quizno letter to three of his customers who asked him why he was not selling ETC books.  "The Lanham Act prohibits only those false or misleading statements that occur in the context of 'commercial advertising or promotion.'"  *Wilchcombe v. Teevee Toons, Inc.*, 515 F. Supp. 2d 1297, 1305 (N.D. Ga.,2007)(quoting 15 U.S.C. § 1125(a)(1)(B)).

> To qualify as commercial advertising or promotion, the communication must be commercial speech by a defendant in commercial competition with plaintiff for the purpose of influencing consumers to purchase the defendant's goods and must be disseminated sufficiently to the relevant purchasing public in such a way as to constitute advertising or promotion.

*Wilchcombe v. Teevee Toons, Inc.*, 515 F. Supp. 2d 1297, 1305 (N.D. Ga. 2007)(citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996); *Optimum Technologies,*

*Inc. v. The Home Depot USA, Inc.*, No. 1:04-CV-3260-TWT, 2005 WL 3307508 at *5 (N.D. Ga. Dec. 5, 2005)).

Mills's conduct of sending the letter to only three of his customers and only in response to their inquiries  is not sufficient dissemination to the relevant purchasing public to constitute "commercial advertising or promotion."  Therefore, plaintiff's Lanham claim based on the dissemination of the Quizno letter is due to be dismissed.

Plaintiff also argues:

> A separate, and alternative, claim under the Lanham Act is for false designation of origin:  to the extent QSP claims that its reps were not authorized to market ETC coupon books after April 2004 and ETC should have known this, QSP reps nonetheless marketed ETC's coupon books, hence without permission and causing confusion as to origin in the marketplace, and QSP had actual knowledge of its reps marketing ETC coupon books after April 2004.

(Doc. 72-2 at 37.)  This argument is frivolous.  QSP's representatives continued to market ETC's books with ETC's permission and encouragement – regardless of QSP's intent or authorization.

Defendants' Motion for Summary Judgment as to plaintiff's Lanham Act and unfair competition/disparagement claim are due to be granted and such claims dismissed.

## J.  NEGLIGENT SUPERVISION  - COUNT 16

Plaintiff contends that Price should have been aware of the fact that Mills wrongfully converted a number of ETC accounts to EPI accounts.  The record contains no evidence that Mills "wrongfully" converted accounts from ETC to EPI.   There is no non-compete

agreement in place.  Mills as an employee of QSP would be expected to sell the coupon books of the company with which his employer had an agreement.   Because plaintiff has presented no evidence that Mills committed a tortuous act, defendant QSP cannot be liable for negligent supervision.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order granting defendants' Motion for Summary Judgment, (doc. 65), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 15th day of September, 2008.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE